**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JA'MARI JONES, individually and on behalf of all others similarly situated,**<br>Plaintiff,<br>v.<br>**FRONTLINE TECHNOLOGIES GROUP, LLC d/b/a FRONTLINE EDUCATION,**<br>Defendant. | Civil Action No. ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Ja'Mari Jones individually ("Plaintiff") and on behalf of herself and all others similarly situated, bring this Class Action Complaint against Defendant Frontline Technologies Group, LLC d/b/a Frontline Education ("Frontline" or "Defendant"). Plaintiff alleges the following upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including the investigation conducted by her counsel and the public statements of Defendant, affected school districts, and state regulators.

The facts alleged here reflect the limited information Frontline and affected school districts have chosen to make public to date. Frontline alone possesses the forensic findings, system logs, vendor communications, and internal security records that will reveal the full scope and cause of the Data Breach. Plaintiff anticipates that discovery will yield substantial additional evidentiary support for the allegations below.

## NATURE OF THE ACTION

1. Frontline provides administrative software to more than 10,000 K-12 school organizations nationwide. School districts use Frontline Central to manage employment records for their teachers, substitutes, nurses, paraprofessionals, and administrators. They use Frontline's School Health Management platform as the health record for their students. Through the School Health Management platform, school staff document nurse visits, injuries, medications,

immunizations, and screenings, along with counseling, social work, and therapy sessions addressing depression, bullying, and other mental health concerns. Districts also use the platform to bill Medicaid for that care.

2. Frontline therefore holds some of the most sensitive information an educator or a child can have: Social Security numbers, government identification numbers, Medicaid identification numbers, and the physical and mental health histories of minors.

3. The educators and families whose information Frontline holds did not choose Frontline. Their school districts did. They had no say in how Frontline would protect their information. They could only trust that it would.

4. Frontline betrayed that trust.

5. This class action arises from Frontline's failure to protect that information. On August 14, 2026, an unauthorized actor exploited a vulnerability in a third-party software product used by Frontline and gained access to the portion of Frontline's environment containing data for two of its products: Frontline Central, an employee-records platform, and School Health Management, a student nursing-documentation platform (the "Data Breach").[1]

6. Frontline has admitted that the data elements compromised in the Data Breach include Social Security numbers, dates of birth, driver's license numbers, passport numbers, other government identification numbers, Medicaid identification numbers, and student identification numbers.[2] School district disclosures and press reports confirm that names, home and mailing

---

[1] *Frontline Education Notice of Data Breach*, FRONTLINE EDUCATION (Oct. 26, 2026), https://www.frontlineeducation.com/news/frontline-education-notice-of-data-breach ("Frontline Notice"); Stephanie Schappert, *Hackers breach school tech giant serving 50 million students nationwide*, CYBERNEWS (Oct. 27, 2026), https://cybernews.com/news/hackers-breach-school-tech-giant-serving-50-million-students-nationwide/.

[2] Frontline Notice, *supra* note 1.

addresses, and email addresses were also exposed (collectively with the foregoing, and with any health information compromised in the Data Breach, "Private Information").[3]

7. Upon information and belief, the compromised portion of Frontline's environment also contained, or permitted access to, health information maintained in School Health Management, including records of students' nurse visits, medications, immunizations, screenings, and counseling and therapy sessions. Moreover, the Medicaid identification numbers Frontline admits were exposed are themselves health-related information: revealing that its holder is enrolled in Medicaid and links that individual to health care services billed under that number.

8. The scale of the Data Breach is staggering. Frontline has not disclosed a nationwide total, but its filings with just four state regulators report over 800,000 affected individuals, including: 778,372 in Texas, 16,550 in Massachusetts, 7,475 in New Hampshire, and 2,985 in Vermont.[4] Because Frontline's software is used by more than 10,000 K-12 organizations serving more than 50 million students, the true number of victims is likely higher.[5]

9. The victims include some of the most vulnerable people: children whose Social Security numbers, Medicaid identification numbers, and birthdates can be exploited for years before they are old enough to discover the fraud, and public school employees whose permanent identifiers are now in criminal hands.

10. The Data Breach was neither novel nor unavoidable. It began with a vulnerability in software that Frontline chose to deploy, integrate with repositories of Private Information, and connect to its production environment. It was Frontline's responsibility to evaluate that software,

---

[3] Schappert, *supra* note 1; Lawrence Abrams, *Frontline Education breach exposes school district employee data*, BLEEPINGCOMPUTER (Oct. 2, 2026), https://www.bleepingcomputer.com/news/security/frontline-education-data-breach-impacts-school-district-employees/.

[4] *Frontline Education data breach affected more than 800,000 people*, TEISS (Oct. 29, 2026), https://www.teiss.co.uk/news/frontline-education-data-breach-affected-more-than-800000-people-18382.

[5] Schappert, *supra* note 1.

monitor it for known vulnerabilities, patch it promptly, isolate it from sensitive data stores, and detect the abnormal access and data movement that followed. Upon information and belief, Frontline did not reasonably take any of these steps.

11. Frontline also kept far more sensitive information, about far more people, for far longer than any legitimate purpose required. District disclosures show that the Data Breach reached *former* employees and *former* students—people whose relationship with the district, and thus any arguable need for Frontline to retain their Social Security and Medicaid numbers, had already ended.[6]

12. Frontline's response compounded the harm. Although Frontline identified the intrusion on August 14, 2026, it failed to begin notifying school districts until on or about October 1, 2026—roughly seven weeks later—and did so through private emails sent from a third-party notification vendor's address that some district officials initially could not confirm were genuine.[7]

13. Frontline did not begin notifying the affected individuals themselves until on or about October 26, 2026—73 days after it discovered the Data Breach.[8] Throughout those 73 days, the employees and children whose Private Information had been taken had no idea they needed to freeze their credit, watch their accounts, or guard against targeted phishing or other malicious misuse of their sensitive data.

---

[6] Niamh Kelly, *Frontline Education Breach: 45,000 at Killeen Alone [2026]*, TECH INSIDER (Oct. 29, 2026), https://tech-insider.org/ie/frontline-education-data-breach-school-districts-2026/; *Security Notice: Frontline Education Data Breach Affects Current and Former SISD Employees*, SHERMAN INDEPENDENT SCHOOL DISTRICT (Oct. 27, 2026), https://www.shermanisd.net/newsroom/~board/homepage/post/security-notice ("Sherman ISD Notice").

[7] Abrams, *supra* note 3; Kelly, *supra* note 6.

[8] Frontline Notice, *supra* note 1.

14. When notice finally came, it was incomplete. Frontline has not identified the third-party software product that was exploited, when unauthorized access first began, who was responsible, how much data was taken, or whether it received a ransom demand.[9]

15. Frontline's belatedly offered remedy is inadequate. It is offering adults two years of credit monitoring and offering minors only "cyber monitoring."[10] Neither offering addresses the lifelong risks that follow the theft of a Social Security number or a child's identity, the privacy harms endured by individuals as a result of exposure of their highly personal and sensitive private health information, and neither compensates victims for the time, expense, and anxiety the Data Breach has already caused.

16. Plaintiff brings this action on behalf of herself and all similarly situated individuals to recover damages for the harm Frontline has caused, to obtain restitution of the benefits Frontline unjustly retained by failing to fund reasonable security, and to obtain injunctive and declaratory relief requiring Frontline to secure the Private Information it continues to hold.

## PARTIES

### A. Plaintiff

17. Plaintiff Ja'Mari Jones is an adult citizen and resident of Millville, New Jersey where Plaintiff Jones intends to remain. At all relevant times, Plaintiff Jones has been employed as a Coach by Cumberland Regional District which used Frontline Central. As a condition of employment, Plaintiff Jones was required to provide Private Information, which was transmitted to and maintained in Frontline's systems. At all relevant times, Plaintiff Jones has also been employed as a Special Education Compliance Specialist by Bridgeton Public Schools, which on

---

[9] *Frontline Education data breach affected more than 800,000 people*, *supra* note 4; Kalleigh Lane, *Student SSNs and Medicaid IDs Exposed in School Software Breach*, ALL ABOUT COOKIES (Oct. 28, 2026), https://allaboutcookies.org/frontline-education-data-breach.

[10] Frontline Notice, *supra* note 1.

information and belief, also used Frontline products that required Plaintiff Jones to provide, Private Information, which was transmitted to and maintained in Frontline's systems.

**B. Defendant**

18. Defendant Frontline Technologies Group, LLC is a Delaware limited liability company with its principal place of business at 550 E. Swedesford Road, Suite 360, Wayne, Pennsylvania 19087.[11] Frontline does business under the name "Frontline Education."[12]

19. Frontline is a subsidiary of Frontline Technologies Parent, LLC, a Delaware limited liability company.[13] Frontline provides administration software to educators across the United States through three product lines: human capital management, business operations management, and student management.[14]

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) the proposed Class includes more than 100 members; (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one member of the proposed Class, including Plaintiff, is a citizen of a State different from Defendant. For purposes of 28 U.S.C. § 1332(d)(10), Frontline, an unincorporated association, is a citizen of Delaware, the State under whose laws it is organized, and Pennsylvania, the Commonwealth where it has its principal place of business. Plaintiff is a citizen of New Jersey, as are hundreds or thousands of other Class members.

---

[11] *Frontline Techs. Parent, LLC v. Murphy*, No. 2023-0546-LWW, 2023 WL 5424802 (Del. Ch., Aug. 23, 2023); Fla. Div. of Corps., Detail by Entity Name: Frontline Technologies Group LLC (Doc. No. M15000003572) (Apr. 23, 2026), https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=forl-m15000003572-acf5b0ef-1751-4399-b59c-3110111c37ba&transactionId=m15000003572-fc1ade1e-6b6c-4143-8a8a-0b916baa1e60&formatType=PDF (listing Delaware as state of organization and a principal address of 550 E. Swedesford Road, Suite 360, Wayne, PA 19087).
[12] Frontline Notice, *supra* note 1.
[13] *Frontline Techs. Parent*, 2023 WL 5424802 at *1.
[14] *Id.*

21. This Court has general personal jurisdiction over Frontline because Frontline maintains its principal place of business in this District. Frontline also purposefully directed the conduct at issue from this District, including its data security policies, vendor and software management decisions, incident response, and breach notification decisions.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Frontline resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Frontline's Business Depends on the Sensitive Data of Educators and Schoolchildren

23. Frontline describes itself as a provider of administration software "purpose-built for K-12."[15] Its products span human resources management, student solutions, and business operations.[16] Frontline's tools manage recruiting, applicant tracking, onboarding, employee records, professional development, evaluations, absences, and substitute management, and provide district-level analytics for operational, financial, and student data.[17]

24. Frontline's reach across American education is vast. It supports more than 10,000 K-12 organizations—including public school districts, charter networks, and private school systems—serving more than 50 million students.[18] Its software has been used in more than 80,000 schools.[19]

---

[15] Frontline Notice, *supra* note 1.
[16] Schappert, *supra* note 1.
[17] *Frontline Education data breach affected more than 800,000 people*, *supra* note 4.
[18] Schappert, *supra* note 1.
[19] Teddy Tauscher, *Frontline Education Data Breach Impacts School Employees*, GOVERNMENT TECHNOLOGY (Oct. 16, 2026), https://www.govtech.com/education/k-12/frontline-education-data-breach-impacts-school-employees.

25. Two Frontline products are at the center of this case. Frontline Central is Frontline's employee-management platform, and School Health Management is its platform for student nursing documentation.[20] At least one affected district has explained that its School Health Management system supported both nursing documentation and Medicaid billing.[21]

26. By design, these products require Frontline to ingest and store highly sensitive Private Information. Frontline Central houses the employment records of teachers, administrators, nurses, substitutes, and other school staff, including their Social Security numbers, driver's license numbers, dates of birth, government identification numbers, and home addresses. School Health Management houses students' names, dates of birth, student identification numbers, and Medicaid identification numbers, along with records of their health care at school.

27. Frontline profits handsomely from this arrangement. School districts and state education agencies pay Frontline for its software and services with public funds. Public expenditure records from a single State, Delaware, reflect more than $750,000 in payments from its Department of Education and local school districts to Frontline in 2026 alone.[22]

28. The individuals whose information fills Frontline's databases have no direct relationship with Frontline. Employees provide their information because their employer requires it. Students' information is entered because they are enrolled in school and need care from a school nurse. Neither group can opt out, negotiate the terms on which Frontline holds their data, or evaluate Frontline's security practices. They are entirely dependent on Frontline to protect their information.

---

[20] Schappert, *supra* note 1.

[21] Priya Sharma, *Frontline Education Begins Notifying Families After Data Breach*, TECHJOURNAL (Oct. 27, 2026), https://techjournal.org/frontline-school-data-breach.

[22] Del. Open Checkbook, Vendor: Frontline Technologies Group LLC, https://opencheckbook.delaware.gov (last visited Oct. 30, 2026).

### B. Frontline Undertook Obligations to Protect the Private Information It Collected

29. Upon information and belief, Frontline's agreements with its school district customers—including master subscription agreements, data processing terms, and, as to student data, student data privacy agreements—require Frontline to implement and maintain reasonable security measures to protect the Private Information it receives; to use that information only to provide services on the district's behalf; to dispose of that information when it is no longer needed for the purposes for which it was obtained; and, in the event of unauthorized access, to promptly notify the district and provide the information the district needs to notify affected students, parents, and employees.[23]

30. Those obligations exist for the benefit of the employees and students whose Private Information is the very subject of the agreements. A primary reason that a school district would require its vendor to secure Social Security numbers and Medicaid identification numbers is to protect the people to whom those numbers belong.

31. Frontline itself has publicly represented that it maintained "comprehensive security measures" before the Data Breach.[24] Frontline knew that its customers, their employees, and their students relied on Frontline to keep their Private Information secure.

32. Frontline also understood its legal obligations when a breach occurs. In its communications with school districts, Frontline undertook to handle required notifications to state attorneys general and to cover the costs of individual notifications and identity protection services.[25]

---

[23] *See, e.g,* Frontline Education, *Notice of New York Education Law 2-d Rider*, https://sdpc.a4l.org/agreements/2024-04-11_12874_431_signed_agreement_file.pdf (last visited Nov. 3, 2026).
[24] Frontline Notice, *supra* note 1.
[25] Abrams, *supra* note 3.

### C. The Data Breach

33. According to Frontline, on August 14, 2026, its security team "identified a vulnerability in a third-party software product" that Frontline uses, which "allowed unauthorized access to a portion of the environment beginning on August 14, 2026."[26] Frontline has stated that the last day of unauthorized activity was August 15, 2026.[27]

34. The affected portion of Frontline's environment contained data relating to Frontline Central and School Health Management.[28]

35. Frontline has not disclosed which third-party software product was exploited, whether a patch for the vulnerability was available before the attack or how long the attacker was present in its environment.[29] Nor has Frontline disclosed who was behind the attack, how much data was taken, or whether it received a ransom demand.[30]

36. Upon information and belief, the unauthorized actor did not merely view Frontline's data but acquired and exfiltrated it. Frontline's investigation reportedly determined on September 23, 2026, that the unauthorized actor had acquired certain personal information.[31] Contemporaneous reports described the attackers as having stolen employee information, including Social Security numbers.[32]

---

[26] Frontline Notice, *supra* note 1.
[27] *Id.*
[28] *Id.*; Tauscher, *supra* note 19.
[29] Abrams, *supra* note 3; *Frontline Education Notifies K-12 School Districts of Data Breach Exposing Employee Social Security Numbers via Third-Party Software Vulnerability*, TECH JACKS SOLUTIONS (Oct. 5, 2026), https://techjacksolutions.com/scc-intel/frontline-education-notifies-k-12-school-districts-of-data-breach-exposing-employee-social-security-numbers-via-third-party-software-vulnerability/.
[30] *Frontline Education data breach affected more than 800,000 people*, *supra* note 4.
[31] *Frontline Education Data Breach Impacts Staff and Students*, CLAIMDEPOT (Oct. 28, 2026), https://www.claimdepot.com/data-breach/frontline-technologies-2026.
[32] Abrams, *supra* note 3.

37. Upon information and belief, cybercriminals who steal Social Security numbers, dates of birth, and government identification numbers do so to sell or use them, and such information remains valuable for fraud and identity theft for years.

38. The Private Information exposed varies by individual and population. For school employees, district notices report exposure of names, Social Security numbers, dates of birth, home addresses, and personal and work email addresses.[33] At one district, every employee was affected.[34]

39. For students, district notices report exposure of names, student identification numbers, birthdates, Medicaid identification and billing numbers, email addresses, mailing addresses, and, in at least one district, Social Security numbers.[35] Reporting also indicates that information relating to special education programs may have been implicated.[36]

40. The publicly reported district-level figures illustrate the breadth of the harm. Killeen Independent School District reported approximately 45,000 affected current and former employees and others; Austin Independent School District reported 44,652 current and former employees; Greenwood School District 50 in South Carolina reported approximately 16,678 current and former students; Hampton County School District reported 4,880 students and employees; Galveston Independent School District reported 1,942 current and former employees; and Methuen Public Schools in Massachusetts reported more than 1,600 employees.[37]

41. Affected districts have stated that the Data Breach occurred entirely within Frontline's systems. One district explained that the breach "occurred entirely within Frontline's

---

[33] Kelly, *supra* note 6; Sherman ISD Notice, *supra* note 6.
[34] Abrams, *supra* note 3.
[35] Kelly, *supra* note 6; Sharma, *supra* note 21.
[36] Schappert, *supra* note 1.
[37] Kelly, *supra* note 6.

systems and was not caused by any action" of the district or its employees.[38] Others have stated that the incident "originated entirely on Frontline Education's systems."[39]

42. After the Data Breach, Frontline reported that it remediated the vulnerability, engaged an independent cybersecurity firm, and took steps "to further safeguard its systems, including enhancing its security and monitoring controls."[40] These measures were available to Frontline before the Data Breach. Had Frontline implemented these measures beforehand, the Data Breach would have been prevented or its impact substantially reduced.

### D. Frontline's Notice Was Unreasonably Delayed, Fragmented, and Incomplete

43. Frontline did not promptly warn anyone. Instead, beginning on or about October 1, 2026—approximately seven weeks after it identified the intrusion—Frontline began notifying school district officials through private emails sent from a third-party vendor's address, frontline@notifications.cyberscout.com.[41] Some district administrators could not initially confirm that these messages were legitimate.[42]

44. Frontline then put school districts to a choice: allow Frontline to notify affected individuals on the districts' behalf, or opt out by October 16, 2026. Frontline told districts that if they opted out, Frontline would neither provide notification services nor reimburse the districts for the cost of issuing their own notices.[43]

45. Even districts that accepted Frontline's offer were left waiting. One Massachusetts district accepted Frontline's offer on October 5, 2026, yet weeks later its employees still had not

---

[38] Sherman ISD Notice, *supra* note 6.
[39] Kelly, *supra* note 6.
[40] Frontline Notice, *supra* note 1.
[41] Abrams, *supra* note 3.
[42] *Id.*
[43] *Id.*

received notice from Frontline.[44] A Texas district reportedly did not receive information identifying the data involved until October 16, 2026.[45]

46. Frontline's disclosures about students lagged even further behind. Frontline first confirmed that employee information was involved, and only later confirmed that student data was affected across multiple school districts.[46]

47. Frontline did not begin notifying affected individuals until on or about October 26, 2026, when it also posted a notice on its website.[47] Frontline reported the Data Breach to the California Attorney General on or about October 26, 2026, and to the Vermont Attorney General and the Massachusetts Office of Consumer Affairs and Business Regulation on or about October 27, 2026.[48]

48. It remains unclear why Frontline delayed two months before informing employees and the district of the Breach.[49]

49. Frontline's notice also omits critical details about the exploited software, why the vulnerability was not patched or isolated, or why Frontline retained the information of former employees and former students at all. Frontline's statement that it is "not aware of any examples of data misuse"[50] offers no comfort: stolen data is often difficult for lay-people to locate on the

---

[44] Tauscher, *supra* note 19.
[45] Sherman ISD Notice, *supra* note 6.
[46] Schappert, *supra* note 1.
[47] Frontline Notice, *supra* note 1.
[48] Sharma, *supra* note 21; *Frontline Education Data Breach*, CLASSACTION.ORG (Oct. 27, 2026), https://www.classaction.org/data-breach-lawsuits/frontline-education-october-2026.
[49] Keri Heath, *Data breach impacts thousands of Austin ISD employee's personal information*, AUSTIN AMERICAN-STATESMAN (Oct. 27, 2026), https://www.statesman.com/news/education/article/austin-isd-employee-data-breach-22496555.php.
[50] Frontline Notice, *supra* note 1.

dark web, held for a year or more before it is used, and its fraudulent use may continue for years thereafter.[51]

**E. The Data Breach Was Foreseeable**

50. Frontline knew, or should have known, that it was an attractive target. A single education-technology vendor that aggregates the records of thousands of school districts and millions of minor students and educators is a concentration point of risk: one successful intrusion yields the identities of hundreds of thousands of people at once.

51. The education-technology sector has suffered a string of high-profile attacks. The Data Breach followed a series of major breach announcements by leading education-technology platforms, including Frontline's competitors and peers in the K-12 software market like PowerSchool and Instructure.

52. Exploitation of vulnerabilities in third-party software components is a well-known and frequently used attack vector. Federal guidance and industry frameworks have for years directed organizations to inventory the software they run, track vulnerabilities in third-party components, apply patches promptly, and manage the risks posed by their software suppliers.[52]

53. Social Security numbers, Medicaid identification numbers, and other government identifiers are among the most valuable data elements to criminals precisely because they are difficult or impossible to change. Frontline knew that the theft of this information would expose victims to identity theft, financial fraud, medical identity theft, and targeted phishing.

---

[51] U.S. Gov't Accountability Off., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 4, 2007), https://www.gao.gov/products/gao-07-737.

[52] Nat'l Inst. of Standards & Tech., *The NIST Cybersecurity Framework (CSF) 2.0* (Feb. 26, 2024), https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.29.pdf ("NIST CSF 2.0").

54. The risks are especially acute for the minor children whose information Frontline held. Children's Social Security numbers are prized by identity thieves because they typically have no credit history and are rarely monitored, so fraud committed in a child's name can go undetected for years, often until the child applies for a student loan, a job, or a first apartment. The FBI has warned that the compromise of student data collected by education technology services could enable social engineering, bullying, tracking, identity theft, and other means of targeting children.[53]

55. Information about a child's health compounds that danger. Upon information and belief, the compromised portion of Frontline's environment included, or allowed access to, records maintained in School Health Management, including information about students' medical conditions, medications, and counseling and mental health services. Combined with a child's name, date of birth, home address, school, and student identification number, that information allows a bad actor to craft highly convincing communications aimed at a child or the child's family—posing, for example, as a school nurse, counselor, pharmacy, or health care provider who appears to know the child's condition and treatment. Such information can also be used to identify, locate, and exploit children who are especially vulnerable because of a disability, a health condition, or mental health struggles, exposing them to manipulation, exploitation, and threats to their physical safety.

### F. Frontline Failed to Follow FTC Guidance and Industry-Standard Security Practices

56. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits unfair practices in or affecting commerce. The Federal Trade Commission ("FTC") has

[53] *See, e.g.,* Fed. Bureau of Investigation, Public Service Announcement, *Education Technologies: Data Collection and Unsecured Systems Could Pose Risks to Students* (Sept. 13, 2018), https://www.ic3.gov/PSA/2018/PSA180913.

long treated a company's failure to employ reasonable and appropriate measures to protect consumers' personal information as an unfair practice under Section 5.

57. The FTC's guidance for businesses directs companies to know what personal information they hold; to keep only what they need; to protect the information they keep, including through encryption; to properly dispose of information they no longer need; to monitor their networks for unusual activity and large outbound data transfers; and to have a plan for responding to security incidents.[54]

58. Industry frameworks, including the NIST Cybersecurity Framework 2.0, likewise call on organizations to maintain asset and software inventories, manage supply-chain and third-party risk, identify and remediate vulnerabilities, enforce least-privilege access, protect data at rest and in transit, continuously monitor for adverse events, and respond to and communicate about incidents promptly.[55]

59. Upon information and belief, Frontline failed to meet these standards. Among other things, Frontline:

a. failed to maintain an adequate inventory of, and vulnerability management program for, the third-party software running in its environment;

b. failed to timely patch, mitigate, or isolate the vulnerable third-party software product;

c. failed to segment its network so that a compromise of a single third-party component could not reach repositories containing Social Security numbers, government identifiers, and Medicaid identification numbers;

---

[54] Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[55] NIST CSF 2.0, *supra* note 52.

d. failed to enforce least-privilege access controls for the systems and service accounts associated with the vulnerable software;

e. failed to encrypt, tokenize, or otherwise render unusable the most sensitive data elements at rest;

f. failed to minimize the data it collected and to purge the Private Information of former employees and former students once it was no longer needed;

g. failed to deploy monitoring capable of detecting and stopping the unauthorized access and the movement of large volumes of data out of its environment;

h. failed to adequately assess and monitor the security of its software suppliers; and

i. failed to maintain and execute an incident response plan that provided timely, complete notice to affected individuals.

60. Frontline's failure to employ reasonable and appropriate data security measures constitutes an unfair practice prohibited by Section 5 of the FTC Act.

**G. Frontline Was Obligated to Safeguard Student Records**

61. The Family Educational Rights and Privacy Act ("FERPA"), (20 U.S.C. § 1232g; 34 C.F.R. pt. 99) protects student education records from unauthorized disclosure, and its protections extend to records maintained by third parties acting on behalf of educational institutions. Student health records maintained in connection with a school's nursing services and Medicaid billing are among the records FERPA protects.

62. As a vendor entrusted with student health and identity information on behalf of thousands of school districts, Frontline knew that its customers were required to protect that information and that Frontline was expected to meet the same standard.

63. Frontline's failure to secure School Health Management data fell far short of the care that FERPA and the expectations of the education community demand.

**H. The Data Breach Has Caused, and Will Continue to Cause, Serious Harm**

64. The Private Information stolen in the Data Breach is a ready-made toolkit for identity theft and fraud. Social Security numbers, dates of birth, and government identification numbers are the primary identifiers used to open financial accounts, obtain credit, file tax returns, claim government benefits, and obtain employment. Unlike a credit card number, a Social Security number cannot simply be cancelled and reissued.

65. Children face particular dangers. A child's Social Security number is typically unused and unmonitored, which allows criminals to combine it with a fabricated name and birthdate to create a "synthetic" identity, or to use it directly, for years before anyone notices. The fraud is frequently discovered only when the child first applies for a student loan, a job, an apartment, or a credit card—long after the trail has gone cold.

66. The theft of Medicaid identification and billing numbers exposes students to medical identity theft. Criminals use stolen health insurance identifiers to obtain medical care, prescriptions, and equipment in the victim's name, which can corrupt the victim's medical records with false diagnoses and treatments and exhaust or jeopardize the victim's benefits.

67. Passport and driver's license numbers enable the creation of counterfeit identification documents and the circumvention of identity verification by financial institutions and government agencies.

68. Combined with victims' names, home addresses, email addresses, and the identity of the school or district with which they are affiliated, the stolen data also enables highly convincing targeted phishing. Affected districts have already warned employees to beware of

fraudulent emails, texts, and phone calls impersonating Frontline, TransUnion, district technology staff, and banks.[56] At least one district recommended that its staff proactively place credit freezes with all three major credit bureaus.[57]

69. These risks are long-lasting. According to the U.S. Government Accountability Office, stolen data may be held for a year or more before it is used to commit identity theft, and once stolen data has been sold or posted online, its fraudulent use may continue for years.[58]

70. As a result of the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injuries including:

a. the unauthorized disclosure, theft, and loss of control of their Private Information;

b. a substantial and imminent risk of identity theft, fraud, and medical identity theft;

c. lost time and productivity spent reviewing financial and benefits statements, monitoring credit, placing and maintaining credit freezes, changing passwords, and responding to phishing attempts;

d. out-of-pocket costs for credit monitoring, identity theft protection, credit freezes, and related services;

e. the diminished value of their Private Information, for which a well-established legitimate and illicit market exists;

f. anxiety, emotional distress, and loss of privacy; and

g. the continued risk to their Private Information, which remains in Frontline's possession and subject to further compromise so long as Frontline fails to adopt adequate security measures.

---

[56] *Frontline Data Breach*, COLQUITT COUNTY SCHOOL DISTRICT, https://www.colquitt.k12.ga.us/departments/human-resources-and-employee-relations/frontline-data-breach (last visited Oct. 30, 2026).
[57] Tauscher, *supra* note 19.
[58] U.S. Gov't Accountability Off., *supra* note 51.

71. Frontline's offer of two years of credit monitoring for adults and "cyber monitoring" for minors is inadequate.[59] The risks created by the Data Breach will last for decades. Credit monitoring detects some fraud only after it has occurred, does nothing to prevent medical identity theft or phishing, and is of limited value to children who have no credit history to monitor. Parents must now take on the burden of checking for, freezing, and monitoring credit files in their children's names until those children reach adulthood—and the children must continue that vigilance for the rest of their lives.

**I. The Experience of Plaintiff Jones**

72. On or about October 27, 2026, Plaintiff Jones received notice that Plaintiff Jones' Private Information had been compromised in the Data Breach. Frontline has stated that each individual's affected data was identified in the notification sent by TransUnion on Frontline's behalf.[60]

73. The notice to Plaintiff Jones identified Plaintiff Jones' Social Security number as among the information exposed. Plaintiff Jones also believes, based on the information that she provided to Frontline, that her full name, date of birth, address, and email would also be among the information exposed.

74. Plaintiff Jones is careful with her Private Information. Plaintiff Jones does not knowingly share her Social Security numbers or other identifiers with untrusted parties, and stores documents containing that information securely.

75. Since learning of the Data Breach, Plaintiff Jones has spent at least five hours taking actions to mitigate harm as a result of the Data Breach—time Plaintiff Jones otherwise would have spent working, caring for family, or on other activities—reviewing the notice, researching the Data

---

[59] Frontline Notice, *supra* note 1.
[60] *Id.*

Breach, reviewing financial accounts and credit reports, and considering credit freezes. Plaintiff Jones will need to continue these efforts for years to come.

76. Since learning of the Data Breach, Plaintiff Jones has suffered significant anxiety, stress, and fear. Plaintiff Jones worries constantly that criminals now hold her Social Security number. Unlike a password or credit card number, a Social Security number cannot simply be changed, and Plaintiff Jones fears it will be used to open accounts, take out loans, file fraudulent tax returns, obtain medical care or government benefits, or commit other fraud in her name for years to come.

77. Plaintiff Jones has a continuing interest in ensuring that her Private Information, which upon information and belief remains in Frontline's possession, is protected from further compromise.

## CLASS ACTION ALLEGATIONS

78. Plaintiff Jones brings this action on behalf of herself and all others similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4), on behalf of the following Class and Subclasses:

> **Nationwide Class:** All individuals residing in the United States whose Private Information was accessed, acquired, or exfiltrated in the Data Breach, including all individuals to whom Frontline, directly or through an agent, sent notice of the Data Breach.

79. Excluded from the Class and Subclasses are Frontline; its parents, subsidiaries, affiliates, officers, employees, and directors; any entity in which Frontline has a controlling interest; all individuals who timely and validly request exclusion; and the judicial officers to whom this action is assigned and their immediate families and staff.

80. Plaintiff reserves the right to modify the Class and Subclass definitions, or to propose additional subclasses, as discovery and further investigation warrant.

81. Numerosity. The members of the Class are so numerous that joinder is impracticable. Frontline's filings with four state regulators alone identify more than 800.00 affected individuals.[61] Class members can be identified from Frontline's records, including the records it used to send notice.

82. Commonality and Predominance. Common questions of law and fact exist and predominate over any questions affecting only individual Class members, including:

a. whether Frontline owed Plaintiff and Class members a duty to implement and maintain reasonable security procedures and practices to protect their Private Information;

b. whether Frontline breached that duty;

c. whether Frontline's data security practices complied with the FTC Act, applicable industry standards, and its contractual obligations;

d. whether Frontline knew or should have known of the vulnerability that was exploited and failed to timely remediate or isolate it;

e. whether Frontline unreasonably retained the Private Information of former employees and former students;

f. whether Frontline unreasonably delayed notifying Plaintiff and Class members of the Data Breach;

g. whether Plaintiff and Class members are intended third-party beneficiaries of Frontline's agreements with school districts;

h. whether Frontline was unjustly enriched;

i. whether Plaintiff and Class members are entitled to damages, restitution, and the

[61] *Frontline Education data breach affected more than 800,000 people*, *supra* note 4.

measure of such relief; and

j. whether Plaintiff and Class members are entitled to declaratory and injunctive relief.

83. Typicality. Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class members had their Private Information compromised in the same Data Breach as a result of the same course of conduct by Frontline.

84. Adequacy. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of the Class and have retained counsel experienced in complex class action and data breach litigation.

85. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class members are small relative to the burden and expense of individual litigation against a well-resourced defendant, making individual actions impracticable. Class treatment will conserve the resources of the parties and the Court and avoid inconsistent adjudications.

86. Injunctive and Declaratory Relief. Frontline has acted or refused to act on grounds generally applicable to the Class, so that final injunctive and declaratory relief is appropriate with respect to the Class as a whole under Rule 23(b)(2).

87. Issue Certification. Alternatively, particular issues—including the existence and scope of Frontline's duty, whether Frontline breached that duty, and whether Frontline's notice was unreasonably delayed—are appropriate for certification under Rule 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Nationwide Class)

88. Plaintiff incorporates by reference all preceding factual allegations as if fully set forth herein.

89. Frontline collected, received, stored, and maintained Plaintiff's and Class members' Private Information in the course of its business and for its own profit.

90. By accepting and maintaining that Private Information, Frontline owed Plaintiff and Class members a duty to exercise reasonable care in safeguarding it from unauthorized access, acquisition, and disclosure. That duty included the obligations to design, implement, maintain, monitor, and test reasonable security controls; to manage the risks posed by third-party software in its environment; to retain Private Information no longer than necessary; to detect intrusions promptly; and to notify affected individuals promptly and accurately of a data breach.

91. Frontline's duty arose from the foreseeable risk of harm created by its own conduct in aggregating vast quantities of highly sensitive information about educators and children, and from the special relationship between Frontline and Plaintiff and Class members, who were required to entrust their information to Frontline and had no ability to protect it themselves. Frontline's duty extended to protecting Plaintiff and Class members from the foreseeable criminal conduct of third parties. *See* Restatement (Second) of Torts § 302B.

92. Frontline's duty was further informed by Section 5 of the FTC Act, FERPA, the FTC's data security guidance, and the industry standards described above.

93. Frontline breached its duty of care through the acts and omissions described above, including by failing to remediate or isolate the vulnerable third-party software, failing to segment and encrypt the most sensitive data, failing to purge the data of former employees and students,

failing to detect and stop the unauthorized access and exfiltration, and failing to provide timely and complete notice of the Data Breach.

94. It was reasonably foreseeable to Frontline that its failure to exercise reasonable care would result in the unauthorized access to and theft of Plaintiff's and Class members' Private Information and the resulting harms.

95. But for Frontline's breach of its duties, Plaintiff's and Class members' Private Information would not have been compromised. Frontline's delay in providing notice also deprived Plaintiff and Class members of the opportunity to take timely steps to mitigate their injuries.

96. As a direct and proximate result of Frontline's negligence, Plaintiff and Class members have suffered and will continue to suffer the injuries described above, and are entitled to compensatory, consequential, and nominal damages in an amount to be proven at trial.

**COUNT II**
**BREACH OF CONTRACT (THIRD-PARTY BENEFICIARY)**
**(On Behalf of Plaintiff and the Nationwide Class)**

97. Plaintiff incorporates by reference all preceding factual allegations as if fully set forth herein.

98. Upon information and belief, Frontline entered into written agreements with the school districts and other educational organizations that use Frontline Central and School Health Management. In those agreements, Frontline promised to maintain reasonable safeguards to protect the confidentiality and security of the Private Information it received, to use that information only for authorized purposes, to retain it no longer than necessary, and to provide prompt notice of any unauthorized access.

99. Those promises were made for the direct and intended benefit of the employees and students whose Private Information Frontline would receive. Recognition of Plaintiff's and Class

members' right to performance is appropriate to effectuate the intention of the contracting parties, because the security of employees' and students' Private Information was the very purpose of those provisions.

100. Frontline breached these agreements by failing to maintain reasonable safeguards, by retaining Private Information longer than necessary, and by failing to provide prompt notice of the Data Breach.

101. As a direct and proximate result of Frontline's breaches, Plaintiff and Class members have suffered the injuries described above and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**
**(Pleaded in the Alternative to Count II, on Behalf of Plaintiff and the Nationwide Class)**

102. Plaintiff incorporates by reference all preceding factual allegations as if fully set forth herein.

103. This Count is pleaded in the alternative to Count II.

104. Plaintiff and Class members provided their Private Information, through their schools and employers, for the purpose of receiving educational, health, and employment-related services administered through Frontline's platforms. Frontline accepted and used that Private Information to provide its services and generate revenue.

105. Through this conduct, Frontline entered into implied contracts with Plaintiff and Class members under which Frontline agreed to take reasonable measures to safeguard their Private Information, to retain it no longer than necessary, and to provide timely notice of any data breach. Plaintiff and Class members would not have permitted their Private Information to be entrusted to Frontline absent such an understanding.

106. Plaintiff and Class members performed their obligations by providing accurate Private Information. Frontline breached the implied contracts by failing to safeguard that information and by failing to provide timely notice of the Data Breach.

107. As a direct and proximate result of Frontline's breaches, Plaintiff and Class members have suffered the injuries described above and are entitled to damages in an amount to be proven at trial.

**COUNT IV**
**UNJUST ENRICHMENT**
**(Pleaded in the Alternative to Counts II and III, on Behalf of Plaintiff and the Nationwide Class)**

108. Plaintiff incorporates by reference all preceding factual allegations as if fully set forth herein.

109. This Count is pleaded in the alternative to Counts II and III, to the extent there is no enforceable contract governing the subject matter of this dispute.

110. Plaintiff and Class members conferred a benefit on Frontline in the form of their Private Information, without which Frontline could not provide the services for which school districts pay it. Frontline knew of and appreciated that benefit, and a portion of the public funds paid to Frontline was intended to fund the reasonable protection of that information.

111. Frontline enriched itself by saving the costs it should have spent on reasonable data security measures, including vulnerability management, network segmentation, encryption, data minimization, and monitoring, while continuing to collect revenue derived from Plaintiff's and Class members' Private Information.

112. Under the circumstances, it would be unjust and inequitable for Frontline to retain the benefits it received at Plaintiff's and Class members' expense. Plaintiff and Class members lack an adequate remedy at law to the extent their contract claims fail.

113. Plaintiff and Class members are entitled to restitution and disgorgement of the amounts by which Frontline was unjustly enriched, in an amount to be proven at trial.

**COUNT V**
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**28 U.S.C. §§ 2201, et seq.**
**(On Behalf of Plaintiff and the Nationwide Class)**

114. Plaintiff incorporates by reference all preceding factual allegations as if fully set forth herein.

115. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court may declare the rights and legal relations of the parties and grant further necessary or proper relief. The Court also has broad authority to enjoin conduct that violates the statutory and common-law duties described in this Complaint.

116. An actual controversy exists between the parties regarding Frontline's present and ongoing duty to reasonably safeguard Plaintiff's and Class members' Private Information, and whether Frontline's current security measures satisfy that duty. Upon information and belief, Frontline continues to hold Plaintiff's and Class members' Private Information, and its post-breach measures remain inadequate to protect against further compromise.

117. Plaintiff therefore seeks a declaration that Frontline owes, and continues to owe, a legal duty to secure the Private Information in its possession and to timely notify affected individuals of any breach, and that Frontline's existing security measures do not comply with that duty.

118. Plaintiff further seeks corresponding injunctive relief requiring Frontline, among other things, to:

a. engage independent third-party security auditors to conduct comprehensive assessments, including penetration testing, of its systems on a periodic basis, and

to promptly remediate any deficiencies identified;

b. implement and maintain a vulnerability and patch management program covering all third-party software in its environment;

c. segment its network and apply least-privilege access controls so that the compromise of one component cannot expose repositories of sensitive data;

d. encrypt or tokenize Social Security numbers, government identifiers, and Medicaid identification numbers at rest;

e. purge, in a reasonably secure manner, the Private Information of former employees and former students that is no longer necessary for an authorized purpose;

f. implement continuous monitoring designed to detect unauthorized access and abnormal outbound data transfers;

g. provide affected adults and minors with identity theft protection, credit and identity monitoring, and identity restoration services for a period commensurate with the lifelong risks created by the Data Breach; and

h. submit to periodic compliance reporting for a period to be determined by the Court.

119. If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury, for which they lack an adequate remedy at law, in the event of another breach of Frontline's systems. The hardship to Plaintiff and Class members absent an injunction outweighs the hardship to Frontline of complying with it, and the public interest favors protecting the sensitive information of the Nation's educators and schoolchildren.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff, on behalf of herself and the proposed Class and Subclasses, respectfully request that the Court enter judgment in her favor and against Frontline as follows:

a. certifying the Class and Subclasses under Federal Rule of Civil Procedure 23, appointing Plaintiff as Class representatives, and appointing her counsel as Class counsel;

b. awarding compensatory, consequential, and nominal damages in an amount to be determined at trial;

c. awarding restitution and disgorgement;

d. entering the declaratory and injunctive relief requested herein;

e. awarding pre-judgment and post-judgment interest as permitted by law;

f. awarding reasonable attorneys' fees, costs, and expenses as permitted by law; and

g. granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: November 3, 2026

Respectfully submitted,

*/s/ Jeannine M. Kenney*
Jeannine M. Kenney (PA Bar Id. 307635)
Carlynne A. Wagner (PA Bar Id. 331207)
**HAUSFELD LLP**
325 Chestnut St Unit 900,
Philadelphia, PA 19106
Tel.: (215) 985-3270
jkenney@hausfeld.com
cwagner@hausfeld.com

James J. Pizzirusso*
Nicholas Murphy*
Amanda V. Boltax*
**HAUSFELD LLP**
1200 17th Street, N.W., Suite 600
Washington, DC 20036

Tel.: (202) 540-7200
jpizzirusso@hausfeld.com
nmurphy@hausfeld.com
mboltax@hausfeld.com

Steven M. Nathan*
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel.: (646) 357-1100
snathan@hausfeld.com

*Attorneys for Plaintiff and the Proposed Class*

**pro hac vice* application pending